IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARMEN SMITH                  :    CIVIL ACTION
                              :
                  v.          :
                              :
DELAWARE RIVER                :
STEVEDORES, et al.            :    NO. 07-1864

MEMORANDUM

McLaughlin, J.                                November 28, 2011

This is an employment discrimination action brought pro se by Carmen Smith against a union, the International Longshoreman's Association, Local 1291 (the "Union").  Ms. Smith, who works as a longshoreman, alleges that she was unable to work for the companies who hire at the Port of Philadelphia because of discrimination on account of her sex and retaliation for filing grievances.  The plaintiff alleges that this discrimination prevented her from working the number of hours required to obtain seniority status within the Union.  The defendant has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The Court will grant the defendant's motion.

I.   Procedural History

The plaintiff filed a charge of gender discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 6, 2006, alleging sex discrimination in the assignment

of work hours at the hiring center at the Port of Philadelphia. Compl., Ex. 1.   She alleged that men who began working at the port after she did were receiving more work that herself and other women.  In addition, she alleged that women who were receiving more work were obtaining jobs by providing sexual favors to the foremen at the Port.  Id.  The EEOC issued a right-to-sue letter on March 21, 2007.  Id.

On June 12, 2007, the plaintiff filed this suit against the International Longshoremen's Association, Local 1291; the Delaware River Stevedores Association ("DRS"); Greenwich Terminals, LLC; and the Philadelphia Marine Trade Association ("PMTA").  Id., Ex. 2.  The plaintiff supplemented the reasons for her claim in a request for appointment of attorney submitted on May 8, 2007 (Docket No. 5).  On September 24, 2007, the Court held an on-the-record Rule 16 conference during which the plaintiff explained the basis of her complaint.  Because the plaintiff is pro se, the Court directed that the transcript be made part of Ms. Smith's complaint.  The Court granted Ms. Smith's request for appointment of counsel and ordered the Clerk of Court to attempt to obtain counsel for the plaintiff through the employment litigation panel (Docket No. 23).  Ms. Smith was unable to secure representation.

On November 10, 2008, the Court granted motions to dismiss brought by DRS, Greenwich Terminals, LLC, and PMTA for

failure to exhaust administrative remedies.  Neither DRS or
Greenwich Terminals, LLC was named in Ms. Smith's formal charge
with the EEOC.  PMTA was named in one of Ms. Smith's EEOC charge
questionnaires, but was not named in the formal charge.  The
Court found that Ms. Smith's claims against these three
defendants were not exhausted, but was careful to note that this
dismissal was without prejudice, which meant that the plaintiff
could file administrative charges against these three defendants.
Order Nov. 10, 2008 (Docket No. 36).  The Union remained as a
defendant in the suit.

      During discovery, the Court held several telephone
conferences with the parties to structure discovery so that Ms.
Smith was able to obtain information from the defendant and third
parties (Docket Nos. 49, 51, 56, 59, 62, 72, 75).  In addition to
a filing subpoenas, Ms. Smith provided a list of the documents
she sought from the defendant and third parties at the close of
her deposition.  Def. Mot, Ex. 15 ("Pl. Dep.") 282-90.

      In February of 2010, the Union filed this motion for
summary judgment.  The Court issued an order asking the plaintiff
to "point out any evidence she has that indicates that the union
was involved in the discriminatory or retaliatory acts against
her" (Docket No. 86).  In response, Ms. Smith sent the Court a
one-page letter requesting information about a witness statement
cited in the defendant's motion as well as describing several

-3-

statements made to her at the hiring center (Docket No. 87).  The
defendant responded by letter that the information requested
which was in the defendant's possession had already been provided
to Ms. Smith and was attached to the defendant's motion.  Def.
Ltr. Mar. 24, 2010.

The Court construes the plaintiff's letter as a request
for additional time to conduct discovery.  The Court will deny
that request.  Both the Court and the defendant have worked with
the plaintiff to provide discovery, and the plaintiff has not
advised the Court of additional discovery she has been unable to
obtain or would seek with additional time.

II.  <u>Summary Judgement Record</u>

The defendant provided the Court with a summary
judgment record that includes the complete deposition of the
plaintiff, documentation of the plaintiff's work history, and
grievances she filed.  Because the plaintiff is pro se, the Court
reviewed this material in order to consider any arguments or
evidence in the plaintiff's favor.

A.  <u>Role of the Union and Assignment of Work</u>

The defendant is a labor organization that represents
the longshoremen who load and unload cargo onto and off of
vessels docking in the Port of Philadelphia and transport cargo
at the port.  The Union acts as a collective bargaining agent for

-4-

its members and represents the members in grievances and
arbitrations involving employers.  Def. Mot, Ex. 9 ("Butler
Aff.") ¶ 4.   The Union is governed by its elected officers and
executive board.  Boise Butler currently serves as the President
of the Union, and John Lafferty, Darryl Larke, and John "Sonny"
Howlett all serve as business agents.  Id. ¶ 3.

     The Union is party to a collective bargaining agreement
("CBA") with the Philadelphia Marine Trade Association ("PMTA").
Id. ¶ 9.  The PMTA is a multi-employer bargaining association
that represents employers in the stevedoring and terminal
business who employ workers at the port.  Butler Aff. ¶ 9; Def.
Mot., Ex. 13 ("Doland Aff.") ¶ 2.  The Union does not employ the
longshoremen who work at the port; rather, longshoremen are
employed by individual PMTA member companies.  Butler Aff. ¶¶ 5-
6, 9.

     PMTA member companies hire employees at the port's
hiring center, also known as the Hall, based upon on the
employers' needs for that day.  Most of the work opportunities
are determined and assigned on a day-to-day basis.  Hiring occurs
both in the morning "shape-up" and throughout the day if PMTA
member companies need additional workers.  Id. ¶¶ 24-25, 36, 41.
Hiring is performed by foremen, who are also known as "bosses."
Id. ¶ 26; Dolan Aff. ¶ 11.  Occasionally the Union business
agents or the PMTA dispatchers at the Hall will identify the

workers requested by the foremen if the foremen are on the job site.  Pl. Dep. 123-24.  The foremen are employed by the individual PMTA member employers.  Butler Aff. ¶ 26; Dolan Aff. ¶ 11.  Because they are longshoremen, they are also members of the Union.  Butler Aff. ¶ 27; Dolan Aff. ¶ 13.

Hiring by the foremen for the PMTA member companies is governed by the CBA.  Union members are placed in seniority groups, a designation noted on color-coded picture identification cards.  The highest seniority group is the Basic Group.  It is followed by the Secondary Workforce.  These groups are subdivided further into seniority levels.  In addition, some jobs require certification that the employee is able to perform certain tasks such as driving forklifts or yard hustler trucks.  Qualified Basic Unit members of the highest seniority level must be offered an available job before Basic Unit members of a lower seniority level may be offered that job.  After jobs have been offered to qualified Basic Unit members, jobs are offered to qualified workers in the Secondary Workforce Group, beginning with the highest seniority group.  After jobs have been offered to Secondary Workforce Group members, the foremen offer jobs to qualified casual workers.  Butler Aff.  ¶¶ 12-14, 19, 47.

Casual workers are those who are new to the industry. Registered Casual workers have passed a physical fitness examination, and foremen are required to hire a Registered Casual

-6-

Worker before hiring a non-registered Casual worker.  Id. ¶ 17.
Every Registered Casual worker has the same seniority as every
other Registered Casual worker.  Id. ¶ 15; Pl. Dep. 46-47.

The date a person enters the industry has no bearing on
seniority.  Instead, longshoremen obtain membership in seniority
groups by working a certain number of hours each contract year,
which runs from October 1 to September 30.  Butler Aff. ¶¶ 16,
20-22; CBA at UNION 000402-03, 426-27.  A Registered Casual
worker must work 1300 hours in two consecutive contract years to
be admitted to the Secondary Workforce.  Butler Aff. ¶ 21.  In
order to work this many hours, Registered Casual workers must go
to the hiring center everyday that work is available, accept jobs
offered, and remain during the day so that they are available if
foremen call for additional workers.  Id. ¶ 23.  Since 2003, the
majority of Casual Workers at the port did not obtain entry to
the Secondary Workforce.  Def. Mot., Ex. 7.

If a Registered Casual worker wants to work on any
particular day, he or she "clocks in" with the PMTA dispatcher at
the hiring center.  Doland Aff. ¶ 17; Butler Aff. ¶ 30.  The
dispatcher issues a card which notes that the Registered Casual
worker registered for work and the PMTA keeps a record.  Doland
Aff. ¶¶ 18, 31. Butler Aff. ¶ 30.  The PMTA also maintains
records of the hours worked by each person and issues the

-7-

appropriate seniority group membership card to longshoremen. Butler Aff. ¶¶ 18-19.

Union business agents oversee hiring at the Hall to ensure that the foremen hire according to the seniority system established by the CBA. Butler Aff. ¶ 3; Def. Mot, Ex. 10 ("Lafferty Aff.") ¶ 2; Def. Mot., Ex. 11 ("Larke Aff.") ¶ 2. Business agents cannot tell foremen whom to hire. Butler ¶ 36. Business agents also investigate grievances submitted by Union members. They review and return signed grievance forms. Lafferty Aff. ¶ 2; Larke Aff. 2; Def. Mot, Ex. 12, ("Howlett Aff.") ¶ 2.

B.   The Nature of the Work

Most longshoreman work is performed either in the hold of a ship, on the ship deck, or on the dock. This work is performed outside, where workers are exposed to the best and worst of weather conditions. The remainder of the work is performed inside a terminal or warehouse, where workers are not exposed to the weather. Butler Aff. ¶ 37. Most of the longshoremen jobs in the port are labor intensive. Id. ¶ 43.

Beginning in 1998, the PMTA required longshoremen who exceeded 200 hours of work in a year to take a physical examination in order to work for a PMTA member company. The exam includes drug and alcohol testing and a strength and flexibility

component.  Id. ¶ 51; Dolan Aff. ¶¶ 22-23; Def. Mot., Ex. 14
("CBA") at UNION 000427.  An employee who fails the examination
for reasons other than drug or alcohol use may retake the
examination after sixty days.  Butler Aff. ¶ 56.  In 2005, the
PMTA notified over one thousand workers than they needed to
undergo the physical examination to continue working.  Id.  Both
men and women take the examination.  A majority of women who take
the examination pass.  Def. Mot., Ex. 6.


    C.   The Plaintiff's Work History

       The plaintiff first worked as a longshoreman in the
Port of Philadelphia in December of 2003, although she began
looking for work at the Hall in 2002.  Def. Mot., Exs. 7, 8; Pl.
Dep. 42.  She is a Registered Casual worker.  Butler Aff. ¶ 8.
The plaintiff has never worked for the Union and has never been
paid by the Union.  Pl. Dep. 184.  Instead, she is paid by the
PMTA companies who hire her.  Id. 183-84.  Ms. Smith usually
works for foreman Carl Bass, who hires for work in a terminal on
behalf of DRS Delmonte, a company that ships fruit.  Id. at 131,
138, 144; Butler Aff. ¶¶ 48-50.

       In March of 2005, the plaintiff was required to take a
physical examination.  She was told by the Union business agents
that all casual workers were required to undergo the examination.
Pl. Dep. 163-66.  Ms. Smith did not pass the strength component

of the physical examination.  <u>Id.</u> 167.  She retook the physical examination and passed the test on the second attempt.  <u>Id.</u> 226; Def. Mot., Ex. 6.  She did not do anything to prepare for the second examination.  <u>Id.</u> 226.  The plaintiff did not work between the time she did not pass the first exam in March of 2005 and the time she passed the second exam in July of 2005.[1]  <u>Id.</u> 226.

The plaintiff worked a total of 202 hours in 2003-04, 645 hours in 2004-05, 1440 hours in 2005-06, 88.9 hours in 2006-07, 664 hours in 2007-08, and 227 hours in 2008-09.  Def. Mot., Ex. 7.

C.   <u>Female Longshoremen</u>

When she first began working, several men at the hiring center told the plaintiff that longshoremen work was not cut out for women.  Pl. Dep. 77.  Others told her it was a man's job.  Foreman Dwight Jones may have been among those who told the plaintiff this.  <u>Id.</u> 231-32.  Foreman Carl Bass once told Smith that she "should be home cooking eggs and something, you shouldn't be here, this is a man's job."  <u>Id.</u> 191, 225.  He made this comment while the plaintiff was working for him driving a forklift.  <u>Id.</u> 191-92.  The plaintiff also heard Bass say to

---

[1]   The plaintiff was also unable to register for work in February 2007 because of a work-related injury; from July through December of 2008 because she did not have a car; and for most of January 2009 because she did not have a required Transport Workers Identification Card.  Pl. Dep. 26-29, 36-38, and 40-41.

another foreman that "bitch won't make her hours over here" and "like she got a lawsuit against him or she ain't going to make her hours, she ain't going to never make them." Id. 129-30. Smith did not file a grievance regarding the latter statement. Def. Mot., Ex. 21 ("Grievances").

Smith has never been told by a Union officer, or heard a Union officer tell a foreman, that longshoreman work is man's work or not for a woman. Id. 232.

Smith also alleges that the foremen hire women who wear tight clothes, flirt with the foremen, hug the foremen, or give sexual favors to the foremen. Pl. Dep. 173-77. She saw women flirt, wear tight clothes, hug the foremen, and then receive jobs. Id. Smith, however, has never heard a foreman ask a woman for sex or tell a woman she would not get a job unless she had sex with him. Id. 194-95. Madelyn Munsun is a Secondary Workforce member who entered the industry after Smith. She has never been propositioned for sex for a job, nor has she offered sex for a job. She has not experienced discrimination at the hiring Hall or on the job site. Def. Mot, Ex. 22 ¶¶ 1-2, 5, 8, 10.

D.   The Plaintiff's Grievances

Between 2005 and 2008, the plaintiff filed at least twelve grievances with the Union. Def. Mot., Ex. 21 ("Grievances"). In all but three of these grievances, Ms. Smith

states that because of retaliation and discrimination generally she was not chosen for work assignments while others, who had begun looking for work at the hiring center after her, received job assignments.  <u>See</u> Grievances at UNION 000001-02, 05-06; SMITH 000001-02, 05-06, 08-09.  Three different business agents handled these grievances on behalf of the Union: John Lafferty, Darryl Larke, and Albert "Sonny" Howlett.  In each case, the business agent found no evidence of discrimination or retaliation and informed Ms. Smith that she had no seniority over other Registered Casual workers, regardless of when she started work. Both Lafferty and Larke also suggested to Ms. Smith that she take any job offered by any foreman, instead of waiting for jobs offered by Carl Bass.  The business agents suggested that other foreman were unaware of her skills and abilities and therefore more likely to hire other workers they were familiar with. Although she preferred working for DRS Delmonte in the terminal, Lafferty and Larke both suggested she not "hold out" for work with DRS Delmonte.  Howlett Aff. ¶¶ 5, 7, 9; Larke Aff. ¶¶ 4, 6-11; Lafferty Aff. 4, 9, 10-14.

The plaintiff alleged more specific behavior in three grievances.  On January 22, 2007, Ms. Smith reported that Carl Bass told her she would not be getting a job and that "I should have went home and cooked eggs and grits."  Grievances at UNION 000004.  Business agent Lafferty investigated this grievance.

Lafferty Aff. ¶ 4.  Carl Bass denied making the statement.  Id. ¶ 7.  Lafferty found that many Registered Casual workers, both men and women, were not hired on January 22.  He also found that Bass had hired the plaintiff on January 19, 2007.  Later in January of 2007, the plaintiff sought work from and was hired by Bass. Lafferty Aff. ¶ 11.

Smith also filed a grievance stating that on April 23, 2007, while working for Bass, she requested to be reassigned because the men around her were being disrespectful.  Bass then told her that "this is a man['s] job if you don't like it go home."  Grievances at SMITH 000003.  Business agent Howlett investigated this grievance.  Bass denied both making the statement and that the plaintiff had informed him that anyone had been disrespectful.  He confirmed that the plaintiff requested to be reassigned, a request she often made.  Howlett told Bass that no form of disrespect would be tolerated by the Union.  Howlett Aff. ¶¶ 5, 10-11.  Bass had previously admitted to the Union to making a similar comment that longshoreman work was for men to Basic Unit member Janet Elam.  Butler Aff. ¶ 60.  Later in 2007 and through 2008 and 2009, Bass continued to hire the plaintiff. Def. Mot, Ex. 18.

On March 23, 2008, Ms. Smith wrote that she handed her identification card to Sonny Howlett and he "said what do you

want me to do with this wipe my ass?" and then made a gesture as
if he was wiping his behind.[2]  Grievance at SMITH 000007.

    E.    Retaliation

        Ms. Smith also alleges that the foremen retaliate
against her for filing grievances by hiring their family and
friends and not her..  Pl. Dep. 110, 11819, 144-45, 223.  Smith
believes that the Union business agents told the foremen not to
hire her after she filed her grievances.  Id. 128.  She believes
this occurred because after she filed grievances, the foremen
"all of a sudden . . . look at [me] a different type of way."
Pl. Dep. 129.  She has not heard a business agent tell a foreman
not to hire her, and foremen have hired her after she filed
grievances.  Id. 128-29.  None of the business agents have ever
told a foreman not to hire the plaintiff.  Lafferty Aff. ¶ 18;
Larke Aff. ¶ 23; Howlett Aff. ¶ 16.

---

        [2]    This grievance was supplied to the defendant during
discovery; it is not clear that it was submitted to the defendant
at the time it was written.  It is not signed by a business
agent, and Boise Butler, the president of Local 1291, stated that
he did not receive the grievance prior to this litigation.
Butler Aff. ¶ 59.  Reading the facts in the light most favorable
to the non-movant, however, the Court will assume that this
grievance was submitted.

III. <u>Analysis</u>[3]

Ms. Smith brings suit against the Union for claims of sexual discrimination and retaliation arising from hiring by the foreman at the Hall.  Although Ms. Smith does not specify the statute under which she seeks to bring these claims, the Court will analyze Ms. Smith's claims under Title VII.

A.   <u>Discrimination and Retaliation Claims</u>

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of sex.  42 U.S.C. § 2000e-2(a).[4]  The fact that "some of the supervisors and

---

[3]   A party is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be satisfied by demonstrating the party who bears the burden of proof lacks evidence to support his case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law and "genuine" if a reasonable jury could find for the nonmoving party based on the evidence presented on that issue. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In making its determination, the court must consider the evidence in a light most favorable to the nonmoving party. <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 251 n.12 (3d Cir. 2010). Once a properly supported motion for summary judgment is made, the burden of production then shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue for trial. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 250.

[4]   The Supreme Court's decision in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), governs Title VII discrimination claims. <u>See</u> <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 409 (3d Cir. 1999). Under the <u>McDonnell Douglas</u> framework, a plaintiff alleging gender discrimination must establish by a preponderance of the evidence a prima facie case of discrimination: (1) she is

workers who are alleged to have discriminated against the [plaintiff] may have been members of the Union" does not make the Union an employer, so long as they were acting in a capacity separate from their union roles.  Anjelino v. New York Times Co., 200 F.3d 73, 95-96 (3d Cir. 1998).

The defendant is not liable under Title VII as an employer; the plaintiff never worked for the defendant or received wages from the Union.  When she is hired at the Hall, she is hired by foremen who are acting on behalf of the stevedore and terminal companies, not on behalf of the defendant.

A labor union can be held liable under Title VII if the record demonstrates that "the Union itself instigated or actively supported the discriminatory acts allegedly experienced."  Id.; see also 42 U.S.C. § 2000e-2(c) (unlawful for a union to cause "an employer to discriminate against an individual").

The Court construes the plaintiff's claims to allege instigation of discrimination by the Union in two ways: (1) that Howlett, an employee of the defendant, made disparaging remarks

---

a member of a protected class; (2) she was subject to an adverse employment action; and (3) similarly situated men were treated more favorably, or that other circumstances exist that give rise to an inference of unlawful discrimination.  Id. at 410-12.  To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) her employer took an adverse action against her; and (3) a causal link exists between the protected activity and the employer's adverse action.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).

towards the plaintiff, and (2) that the defendant encouraged foremen not to hire the plaintiff. The plaintiff's other claims allege that the Union supported the discrimination or retaliation of the PMTA companies by: (1) requiring her to take a physical fitness exam that she was unable to pass on account of her sex; and (2) by failing to investigate the grievances she filed. The plaintiff contends that all of these actions prevented her from working sufficient hours each year to obtain seniority status.

## 1. Remark by Howlett

The plaintiff cannot make out a prima facie case of gender discrimination on the basis of the crude remark and gesture by Howlett. Assuming that this event occurred, there is no evidence that this remark was made because of the plaintiff's gender or was more than a single stray remark, which is not sufficient to give rise to an inference of discrimination. Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 368 (3d Cir. 2008) ("[S]tray remarks by decision-makers . . . standing alone, may not give rise to an inference of discrimination [although] such remarks are not irrelevant.").

## 2. Investigation of Grievances

The plaintiff claims that she was discriminated and retaliated against when foremen did not hire her. In several instances the plaintiff filed grievances regarding these

allegations.  Courts have adopted a three-part test for determining if a union supported the discriminatory actions of an employer through failure to investigate grievances.  In order to prevail, a plaintiff must show: (1) that a violation of the collective bargaining agreement occurred with respect to the plaintiff; (2) that the union permitted the violation to go unaddressed; and (3) that the plaintiff was treated less favorably than others similarly situated on account of an impermissible factor such as sex.  See Beck v. UFCW, Local 99, 506 F.3d 874, 884 & n.4  (9th Cir. 2007); see also Bugg v. Int'l Union of Allied Workers of Am., 674 F.2d 595, 598 n.5 (7th Cir. 1982); Yon v. SEPTA, Nos. 01-5231 & 01-5232, 2003 U.S. Dist. LEXIS 20189 (E.D. Pa. Nov. 4, 2003) aff'd, 112 F. App'x 869 (3d Cir. 2004).

     Most of the plaintiff's grievances allege that Registered Casual workers who began work after her were hired when she was not.  There is, however, no seniority within the Registered Casual group.  The foremen can hire any Registered Casual worker, regardless of when the person began looking for work.  Hiring Registered Casual workers who started looking for work after the plaintiff is not a violation of the CBA.

     Likewise, there is no evidence that the defendant supported gender discrimination by the foremen at the hiring center.  Each time the plaintiff alleged in a grievance that men

but not women were being hired, a business agent of the Union investigated the plaintiff's claim.  All of the business agents found that women, including the plaintiff, were being hired and found no evidence of gender discrimination.  The business agents also discussed her grievances with the plaintiff and advised her on how to obtain additional work hours.

The Union also investigated the plaintiff's grievances regarding statements made by Carl Bass.  During both investigations, Bass denied making the statements.  Howlett advised Bass that no form of disrespect would be tolerated by the Union.  In addition, the plaintiff was hired by Bass following these statements.

The plaintiff also alleges that women who were hired wore tight clothes, hugged and flirted with the foremen, and provided sexual favors to the foremen.  The plaintiff never filed a grievance regarding this allegation.  The plaintiff saw women flirt with the foremen, but no evidence suggests that a foreman or a woman at the port ever offered to exchange a job for sexual favors.  The Court concludes that no reasonable jury could find that the defendant was aware of these allegations of improper behavior by either the women or the foremen, and therefore could not conclude that the Union supported this alleged sexual harassment.

-19-

The plaintiff also cannot show that the defendant
treated her differently on the basis of her sex.  Each of her
claims against the foremen were investigated by Union business
agents.  There is no evidence that the defendant treated the
plaintiff differently than other members or did so on the basis
of her gender or in retaliation for filing grievances.

### 3.   Physical Fitness Exam

Pursuant to the CBA between the Union and the PMTA, all
longshoremen are required to take a physical fitness test in
order to work at the Philadelphia Port.  There is no evidence
that the plaintiff was singled out by the PTMA or the Union to
take the test or that she was required to take the test because
of her gender.  The plaintiff, as well as over one thousand other
workers, were required to take the examination in 2005.  There is
also no evidence that the plaintiff failed the test because of
her gender.  The plaintiff passed the test on her second attempt
without any additional preparation.

### 4.   Encouraging Unlawful Acts

The plaintiff engaged in a protected activity by filing
grievances and this lawsuit.  There is also no evidence, however,
to support the plaintiff's claim that she was retaliated against
for doing so.  The plaintiff was hired by foremen after she filed
grievances and after she filed the present lawsuit, although she

alleges that she was unable to obtain seniority status as a
result of not being hired often enough.  No evidence suggests
that the Union business agents told the foremen not to hire the
plaintiff.  The plaintiff offers only speculation that the
foremen did not hire her because of retaliation.

The Court concludes that no reasonable jury could find
that the defendant discriminated or retaliated against the
plaintiff or that the defendant instigated or supported
discriminatory or retaliatory behavior by the foremen.

B.    Exhaustion of  Administrative Remedies as to
      Retaliation Claims

In order to bring a Title VII claim, plaintiffs must
first exhaust their administrative remedies "before they will be
allowed access to federal judicial relief."  Watson v. Eastman
Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000).  The defendant
argues that the plaintiff's retaliation claims should be
dismissed because she did not allege retaliation in her EEOC
complaint.  Because the Court finds that there is not sufficient
evidence for the plaintiff's retaliation claim to survive a
motion for summary judgment, the Court does not address this
argument.

An appropriate order shall issue.